Ronald WARD *v.* STATE of Arkansas

CR 88-145                                      770 S.W.2d 109

Supreme Court of Arkansas
Opinion delivered April 24, 1989

*Joseph B. Brown, Jr.* and *Samuel Turner, Jr.*, for appellant.

*Steve Clark*, Att'y Gen., by: *Clint Miller*, Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. At his first trial of this case the appellant was convicted of capital murder and sentenced to death. He appealed, and we reversed and remanded because of the improper use of peremptory challenges by the State to exclude black people from the jury. *Ward* v. *State*, 293 Ark. 88, 733 S.W.2d 728 (1987). Upon retrial, appellant was again convicted of capital murder, but this time he was sentenced to life in prison without parole. He now appeals from the second conviction. This time, we affirm.

Because appellant argues that the trial court erred in denying his motion for a directed verdict, it is necessary to recite the evidence in some detail. On April 12, 1985, Audrey Townsend and Lois Townsend Jarvis, two elderly sisters, and Chris Simmons, their twelve-year-old great-great nephew, were found dead in the sisters' home in West Memphis. Each had multiple deep stab wounds. In addition, Audrey Townsend had been raped, and the house had been ransacked. A large knife was found in the kitchen sink. A witness, Ricky Vail, saw the appellant on the night in question close to Vail's house, which was just across the street from the victims' house. Audrey Townsend's vagina contained semen from someone who had type O blood and who

secreted the H factor into his blood; appellant had type O blood and is a secretor of the H factor. A hair was found on the underwear which Audrey Townsend was wearing when she was raped and murdered; that hair is microscopically similar to hair taken from appellant's head. A pubic hair was removed from the pubic area of Audrey Townsend; that hair had the same microscopic characteristics as a hair taken from appellant's pubic area. Two hairs were found on a sweater seized from appellant's bedroom; one, a pubic hair, was microscopically similar to the pubic hair of Lois Townsend Jarvis, and the other was microscopically similar to the hair on the head of Chris Simmons. Appellant's fingerprints were found on broken pieces of glass which were recovered from the crime scene. Appellant's fingerprints were on an insurance notice which was found at the crime scene. His fingerprint was found on a window pane at the rear of the victims' house. His fingerprint was found on a light bulb which was near the back door of the victims' house. His fingerprints were found on the doorknob of a closet in a bedroom of the victims' house. His fingerprints were found on the kitchen window of the house. Appellant gave a lengthy in-custodial statement in which he said that someone named Ike forced him to break in, ransack the house, leave his fingerprints all about, rape Audrey Townsend, and then Ike committed the murders; appellant never could recall Ike's last name, nor could he locate him. Just before the initial hearing, the police heard appellant tell his attorney, "Um, something just came over me, its just like, I didn't mean to, just something came over me, made me go in that house and stuff like that, I didn't, I just wasn't myself."

Appellant contends that the foregoing evidence does not show that he acted with a premeditated and deliberated purpose in killing two or more people in one criminal episode. *See* Ark. Code Ann. § 5-10-101(a)(4) (Supp. 1987). In order to prove that an accused acted with a premeditated and deliberated purpose the State must prove: (1) that the accused had the conscious object to cause the death of another; (2) that the accused formed the intention of causing the death before acting; and (3) that the accused weighed in his mind the consequences of a course of conduct, as distinguished from acting suddenly on impulse without the exercise of reasoning power. *Ford* v. *State*, 276 Ark. 98, 633 S.W.2d 3, *cert. denied*, 459 U.S. 1022 (1982). A

defendant's premeditated and deliberated culpable mental state can be inferred from the circumstances of the murder, such as the character of the weapon used, the manner in which it was used, the nature, extent, and locations of the wounds inflicted, and the conduct of the accused. *Ricketts* v. *State*, 292 Ark. 256, 729 S.W.2d 400 (1987). Premeditation and deliberation are not required to exist for any particular length of time and may, in fact, be formed in an instant. *Garza* v. *State*, 293 Ark. 175, 735 S.W.2d 702 (1987). Such intent may and often must be inferred from circumstantial evidence. *Garza* v. *State, supra.*

■ Here, breaking into the victims' house, ransacking the house, raping one of the women, and then inflicting numerous, deep, and fatal stab wounds with a large knife upon three different victims is substantial circumstantial evidence of a premeditated and deliberated culpable mental state.

■ Appellant next argues that the trial court erred in excluding the proffered testimony of John Golden. The argument is without merit. Appellant wanted to call John Golden to testify that a Ricky Smith had supposedly told Golden that Smith and another man had planned to kill three white people in West Memphis, take their cocaine, and blame it on a fifteen-year-old boy named Ward (appellant). Ricky Smith was available to testify but appellant apparently did not want to call him because he would deny having ever made such a statement. Appellant sought to introduce Smith's alleged hearsay statement through Golden by A.R.E. § 803(24), the residual exception. The rule provides that a statement should not be excluded as hearsay, even though the declarant is available, when the statement is trustworthy and reliable. A good example of the rule in use is where a postmark, which is reliable hearsay, is offered to prove that a letter was mailed from the city shown on the postmark. *See U.S.* v. *Cowley*, 720 F.2d 1037 (9th Cir.), *cert. denied*, 465 U.S. 1029 (1983). We have said it "must have circumstantial guarantees of trustworthiness equivalent to those supporting common law exceptions." *Blaylock* v. *Strecker*, 291 Ark. 340, 350, 724 S.W.2d 470, 475 (1987). It is intended that the residual hearsay exception rule will be used very rarely, and only in exceptional circumstances. Cotchett and Elkind, *Federal Courtroom Evidence* 286 (1987).

In determining trustworthiness or reliability, we ordinarily will not look so much to the reliability of the original declarant, but instead to the reliability of the statement itself. This is because the reliability or credibility of the declarant is more a matter for the jury, rather than a matter of admissibility. However, in this case, there was testimony that John Golden had been in a mental institution, was presently under the care of a psychiatrist, is easily misled, is prone to fantasize, gets confused often, makes up stories to fit a situation, and "lives in his own world." More importantly, John Golden originally told the police that on April 11, one day before the murders, that Ricky Smith had stolen a large amount of money and asked for a ride to Horn Lake, Mississippi. Golden told the police he took Smith to an apartment in Horn Lake where they saw a white man dressed in cowboy attire. Golden did not mention Smith blaming the murders or anything else on appellant. Even though the police had not had a report of anyone stealing money, they went to the apartment, which turned out to be a duplex, and found a black man occupied one side and a white man the other. Neither wore cowboy attire nor knew Smith. Later, after the murders had occurred, and after the media reports of them, Golden began to change his story. He also asked for a reward. Still, it was not until the first trial of this case that Golden disclosed any information, supposedly gained on the way to Horn Lake, about Smith disclosing a plot to blame appellant for the murders. Golden's statement clearly did not meet the standard for trustworthiness or reliability.

The appellant next argues that the trial court erred in admitting an in-custodial statement. This argument is also without merit. The appellant was given his *Miranda* warning and gave an inculpatory statement. A few days later two policemen took him to the Municipal Court in West Memphis for the appointment of a defense attorney and the setting of bond. One of the policemen took along a tape recorder. It was in plain sight as it had a strap which was around the policeman's neck. The officers, the appellant, and the public defender were standing in a hallway just outside the courtroom. The public defender twice asked the appellant if the police had explained his rights. He responded affirmatively both times. He then specifically asked appellant if he understood that anything he said could be used against him.

Again, he answered, "yes sir." The attorney again cautioned appellant to keep that warning in mind and even again asked if appellant understood that anything he said could be used against him. The appellant again said he understood. In other words, the public defender twice asked appellant if he understood his rights and twice specifically asked if he understood that anything he said could be used against him. All four responses were "yes." Counsel further advised appellant to keep that warning in mind. The public defender asked appellant if there was anything which appellant wanted the attorney to tell the judge. The appellant said he had never been in trouble before, and then, in front of the police, blurted out another incriminating statement.

The actions of the public defender do not constitute ineffective assistance of counsel. The appellant did not offer any proof about the layout of the courtroom or any adjacent rooms, or whether the attorney could have held a private conversation with appellant. The attorney was not called and asked about the circumstances of the event or surroundings. The public defender did not ask a question which caused the incriminating statement. Certainly, after the four questions about appellant's rights, and four affirmative responses, plus the warning, counsel could not have anticipated that the appellant would blurt out an incriminating statement.

Even if counsel's conduct were professionally unreasonable, the judgment of conviction must stand because appellant has not demonstrated that the error had a prejudicial effect on the outcome of his trial. *See Strickland* v. *Washington*, 466 U.S. 668 (1984) and *Pruett* v. *State*, 287 Ark. 124, 697 S.W.2d 872 (1985).

The appellant, who was fifteen years old at the time he committed the murders, next argues that the trial court committed error in excluding three prospective jurors because they were unalterably opposed to the death penalty. *See Thompson* v. *Oklahoma*, ___ U.S. ___, 108 S. Ct. 2687 (1988). The appellant raised this point at his first trial, but did not raise it at the second trial. It was necessary for him to bring the issue before the trial court at the second trial in order to have the issue preserved for this second appeal. When a case is broadly remanded for a new trial, as this one was, evidentiary objections must be made, the

same as if there had been no first trial. *See Sanders* v. *Walden,* 214 Ark. 523, 217 S.W.2d 357 (1949).

However, even if the issue had been preserved, and even if *Thompson* v. *Oklahoma, supra,* were a clear majority opinion dictating that appellant could not be sentenced to death, we would not reverse. Here, the State sought the death penalty in a bifurcated trial. Accordingly, the jury was death qualified. However, after the jury took thirteen hours to decide the guilt phase of the trial, the prosecutor apparently realized the improbability of the jury imposing the death penalty, and waived the second phase, or death penalty phase, of the trial. If a defendant in a capital case does not receive the death penalty, he cannot obtain reversal of his conviction and sentence on appeal by pointing to errors having to do with the jury's consideration of the death penalty. *Allen* v. *State,* 296 Ark. 33, 39, 751 S.W.2d 347, 350 (1988). In addition, because the State had not yet decided to waive its right to seek a death sentence when the jury was picked, the trial court did not err in death qualifying the jury. *See Buchanan* v. *Kentucky,* 483 U.S. 402 (1987), which held that a joint trial of a defendant, against whom the death penalty is *not* sought, along with a co-defendant, against whom the death penalty *is* sought, does not deprive the defendant of his right to an impartial jury if the jury is death qualified.

Appellant's next two points of appeal are governed by the law of the case doctrine. *See Hickerson* v. *State,* 286 Ark. 450, 693 S.W.2d 58 (1985). First, he argues that five photographs were unfairly prejudicial. These same photographs were admitted in the first trial, and we approved their use. *Ward* v. *State,* 293 Ark. at 101. Second, he argues that the use of his fingerprints was error. We have already rejected that argument. *Ward* v. *State, supra,* 293 Ark. at 99-100.

Pursuant to Rule 11(f) of the Rules of the Supreme Court and Court of Appeals of Arkansas, we state that we find no unassigned error which would cause reversal of this sentence to life without parole.

Affirmed.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice, dissenting. In reversing this case

the first time (see *Ward* v. *State*, 293 Ark. 88, 733 S.W.2d 728 (1987)), this court noted the failure of the trial court to allow the testimony of witnesses Golden and Langford that Harry Smith made statements against his interest. The opinion stated that the testimony of witnesses Golden and Langford would not be admissible "unless corroborating circumstances clearly indicate the trustworthiness of the statement." The opinion further stated that on retrial the judge should make the determination of trustworthiness before deciding if the proffered testimony would be admitted. Upon retrial, when the testimony of Golden was offered, the judge stated: "I am absolutely 100% convinced that my initial ruling three years ago when this case was tried first — that it was inadmissible hearsay — was correct." Such a ruling hardly complies with the mandate in this case.

At the first trial the judge, apparently relying on Arkansas Rules of Evidence Rule 804(b)(5), which applies in the case of unavailable witnesses, ruled that Golden's testimony was inadmissible. Smith, so they said, was unavailable. In fact, the general tone of the state's testimony and presentation was that no such person existed. The court and local authorities evidently considered Smith to be a figment of Golden's imagination. However, at the second trial, after the appellant's attorneys brought up information concerning the missing witness, the court remarked that the local police had located Smith within fifteen minutes after starting to search for him. Thus, a man who was only a figment of the imagination of a witness at the first trial appeared at the instance of the state within fifteen minutes after information was revealed by the defense attorneys regarding his present location and his previous statements against interest.

The question of the testimony concerning statements of Harrison Smith (a/k/a Harry Smith, a/k/a Rick Smith, and a/k/a James Brown), figured in the first reversal and should require a second reversal. After long and laborious efforts to get the alleged statement of witness Smith introduced into evidence at the appellant's second trial, the trial court ended the matter by stating:

> Gentlemen, here's my ruling, and I don't want to hear anymore about this. I am absolutely 100% convinced that my initial ruling three years ago when this case was first

tried — that it was inadmissible hearsay — was correct. I am even more convinced after hearing and observing the demeanor of the so-called Harrison Smith that my ruling was correct. It's inadmissible hearsay. . . . I am going to — let me tell you a few things that are incredible to me, and I am getting tired of this charade. It's incredible to me that in fifteen minutes of effort the police produced the witness that you claimed to have been trying to find. . . . My ruling stands. Let's get on with it.

The discussion at the first trial concerning the attempt to locate Smith and to have him served with a subpoena, culminated with the court's statement: "Well, it doesn't prove he existed, it just proves he attempted to serve a summons on somebody given at that address. Whether they existed or not, I don't know and he doesn't either."

The court ruled at the first trial that the testimony of Golden and Langford was inadmissible under A.R.E. 804(b)(5), which applies when the declarant is unavailable. It is quite obvious to me that the appellant in the first instance offered the hearsay statement of Harry Smith as a statement against interest pursuant to A.R.E. Rule 804(b)(3). Certainly that is essentially the argument which the appellant presents at both trials. A.R.E. Rule 803(24) and A.R.E. Rule 804(b)(5) are identical and read as follows:

Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of truthworthiness, if the court determines that (i) the statement is offered as evidence of a material fact; (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the

declarant.

The rationale for allowing statements of this kind to be introduced is predicated upon the fact that the declarant has admitted to the commission of an act which would hold him up to public ridicule and contempt or expose him to civil or criminal actions in court. See A.R.E. Rule 804(b)(3).

The trustworthiness of the statement of Smith is the matter the trial court should have considered. However, it appears the court decided the trustworthiness of the testimony of Golden and Langford. Without any citation of authority, the majority of this court makes exactly the same mistake.

Rule 803(24) allows into evidence "a statement . . . having equivalent circumstantial guarantees of trustworthiness . . ." as an exception to the hearsay rule. The very words of the rule indicate that the key to the question is governed by the circumstances surrounding the making of the hearsay statement — in this case, the circumstances surrounding Smith's statements to Golden. The majority opinion, without expressly saying so, suggests that the decision is governed by the circumstances surrounding the mental stability of witness Golden, in effect reducing the question to one of Golden's credibility. I submit that the truthworthiness of the testimony of Golden and Langford was a matter of credibility to be considered by the jury.

In support of the reliability of both the proffered testimony of Golden and Langford and the statements against the interest of Smith, certain facts are not disputed. Golden and Langford stated that Harry Smith paid them twenty dollars on April 11, 1985, to drive him from West Memphis, Arkansas to an apartment and to a mobile home (in which he claimed to reside) just south of Memphis, Tennessee. Golden informed the police about carrying Smith to Mississippi, and told them that Smith claimed to have helped rob some white people of a large amount of money and drugs and that Smith bragged that he was going back that night to finish the job. Smith boasted that they would read about it in the paper. Later, Golden stated that Smith had told him that Smith and some other people were going to rob and murder some white people and lay it off on a boy named Ward. It was disputed whether the name Ronald Ward was mentioned to the police before or after Golden learned that Ward was being investigated.

The evidence indicates that Golden went to the police on the 12th of April to try to tell them what Smith had told him. The police were very busy investigating a triple murder at the time. They were too busy to talk to Golden and told him to come back on Monday, the 15th. Golden asserts that when he went back, he mentioned Ward's name or, at the very least, that he told the police that Harry Smith had informed him that Smith was involved in a crime which would fit the facts of the present case.

Ronald Ward was not picked up until April 16 or 17 and them only for identification and fingerprinting. Golden told the police that Smith had also carried some drugs to Mississippi. The proffer included testimony that Harrison Smith was overheard talking with a white man about plans to kill three white people, rob them of cocaine, and pin the crime on a fifteen-year-old boy named Ward.

The testimony of local officials was that Golden was something of a schizophrenic, that he could not be trusted to furnish reliable information, and that he lived in a world of his own. (See the majority opinion for all his blemishes.) However, it should be noted that the police put Golden in the car with them and retraced the steps from West Memphis to Mississippi; Golden took them to the apartment, where the people failed to identify Smith, and then to the mobile home where Smith lived. Smith's mother was located at that address, and some drugs were found, just as Golden had indicated they might be. It seems to me that, as far as the state was concerned, Golden was reliable when he was furnishing information favorable to the state's case, but unreliable when he was furnishing information which would be helpful to the defense. Golden furnished additional information which caused the police in Waukegan, Illinois, to arrest and detain Smith.

In my opinion, the reliability of the testimony of Langford and Golden was established when the officer located the residence where Smith lived (and where his mother still resided), and further when they found the illegal drugs at that location. After Smith was located by the police and brought in, he testified that some people took him to Mississippi after he had left his job on April 11, 1985. He stated that he then left Mississippi and went to Waukegan, Illinois. His mother stated that she carried him to the

bus station at 4:00 or 4:30 p.m. on April 12, 1985. The bodies of the three victims were discovered on April 12, but they may have been killed before midnight on April 11.

The other point on which I disagree with the majority is its conclusion that the first counsel appointed to represent the appellant was not ineffective. It would serve no purpose to cite cases in this instance because it is purely a fact question. In my opinion, no effective defense attorney should have his first interview with his client in the presence of a police officer who, with the attorney's knowledge, is recording the statement. This grossly ineffective assistance by itself should have rendered the statement recorded by the policeman inadmissible.

Some of the decisions of this court dealing with the test of trustworthiness under Rules 803 and 804 are *Hill* v. *Brown*, 283 Ark. 185, 672 S.W.2d 330 (1984); *Tillman* v. *State*, 275 Ark. 275, 6 S.W.2d 5 (1982); *Doles* v. *State*, 275 Ark. 448, 631 S.W.2d 281 (1982); and *David* v. *State*, 269 Ark. 498, 601 S.W.2d 864 (1980). This court noted in *Hill* that all the common-law exceptions to the hearsay rule are based upon necessity or some compelling reason for attaching more than average credibility to the hearsay. "Consequently any new exception must have, in the language of the Rule, circumstantial guarantees of trustworthiness equivalent to those supporting the common-law exceptions." *Hill* at 190. I submit that Smith's statement meets this requirement.

I have no doubt that the proffered testimony of Golden and Langford should have been allowed in evidence because of the very nature of Smith's statements. The trustworthiness of the proffered testimony was clearly established by the extremely incriminating character of these statements. Moreover, the statement: (1) concerned a material fact, (2) was more probative for the purpose offered than any other evidence, and (3) the interests of justice would have best been served by admission of the statements into evidence. The proffered testimony should have been admitted as a clear exception to the rule against hearsay as defined in A.R.E. Rules 803 and 804. It is the responsibility of the jury, not the court, to decide the credibility of this testimony.