ARCHER-DANIELS-MIDLAND COMPANY *v.*
BEADLES ENTERPRISES, INC.

CA 04-1070                                                215 S.W.3d 675

Court of Appeals of Arkansas
Opinion delivered October 12, 2005

[Rehearing denied November 30, 2005.]

*Barber, McCaskill, Jones & Hale, P.A.*, by: *D. Keith Fortner*, for appellant.

*Moore, Serio, Bishop & Helms*, by: *Robert G. Serio*, for appellee.

WENDELL L. GRIFFEN, Judge. Appellee Beadles, Incorporated (Beadles) is a hog-finishing operation owned by Wayne Beadles, Sr., and Wayne Beadles, Jr. This operation takes young hogs, feeds them until they attain a certain weight, and then sells them to slaughterhouses. Beadles makes its own hog feed, part of which contains soybean meal that it purchased from appellant Archer-Daniels-Midland Company (ADM).[1] Beadles sued ADM claiming that ADM's failure to inform Beadles that ADM had sold it soybean meal that might have contained ball clay that was contaminated with dioxin[2] caused a purchaser to reject a shipment of Beadles's hogs and that while the rejected hogs were stored at a receiving center, they contracted salmonella group B, which they later spread to Beadles's facility after the refused hogs were returned, and which caused the death of 2600 of Beadles's hogs over the next few years. Following a bench trial, the circuit judge found that ADM was liable for fraud due to its failure to inform Beadles of the alleged dioxin contamination. We reverse and dismiss because either a crucial element of Beadles's fraud claim — the reason the shipment of hogs was rejected — was proven based solely on inadmissible hearsay or else no proof was given to establish that element of Beadles's claim.

## I. Background Facts

In April and May of 1997, Beadles purchased two shipments of allegedly contaminated soybean meal from ADM. Thereafter, on July 21, 1997, Beadles sold and attempted to ship 126 hogs to an Iowa purchaser, IBP. These hogs had been fed with the allegedly contaminated feed. IBP halted the shipment in Missouri and Beadles's hogs were stored temporarily at a receiving center. During this time, three hogs were slaughtered and tested for dioxin; the test results were negative. In addition, another hog

---

[1] ADM is the successor company for Quincy Soybean Company, which sold the allegedly contaminated soybean meal to ADM.

[2] According to Beadles's complaint, ball clay is an anti-caking agent that is sometimes added to soybean meal. Dioxin is a toxic substance that is found in the environment and is unavoidable at background levels. The levels at which dioxin would adversely affect humans has not been identified. However, as noted herein, the issue in this case is not whether ADM actually sold Beadles dioxin-contaminated soybean meal.

died (cause unknown). Beadles then shipped the remaining 122 hogs back to its farm.

Beadles's hogs are kept in an "old barn" and a "new barn," which are approximately fifty yards apart. Beadles returned the 122 hogs to the new barn, from which they originated. When the hogs returned, they were extremely stressed and laid in an open-flush gutter system to cool themselves. This system washed feces and dirt from the IBP hogs. Other hogs in the new barn that were penned down slope came into contact with that feces and dirt. The IBP hogs were ultimately reshipped and sold to IBP at a reduced price because they lost weight. The hogs that were penned down slope from the IBP hogs began dying approximately two or three weeks thereafter. Beadles sued, claiming that while being stored at the receiving station, the IBP shipment became infected with salmonella group B, which somehow spread to Beadles's other hogs when the IBP shipment was returned and caused an increased death rate in its hog operation through 2001.

A bench trial was held on October 29-30, 2003.[3] The trial court made numerous findings of fact, including the following:

1. ADM knew prior to July 21, 1997, and no later than July 7, 1997, that the federal government was concerned that the soybean meal ADM sold in April and May of that year was contaminated.

2. ADM had a special relationship with Beadles based on their past dealings, and based on its knowledge that the soybean meal it sold to Beadles would be fed to hogs and then placed into the food chain for ultimate human consumption.

3. ADM had a duty to disclose to Beadles that the soybean meal it sold to Beadles was alleged to have been contaminated with dioxin, and that Beadles would not have purchased the soybean meal from ADM had it been so informed.

4. The hogs Beadles attempted to sell to IBP were rejected because of the alleged dioxin contamination.

5. Soon after the IBP hogs were shipped, the hogs in the new barn began to have symptoms of salmonella and other diseases;

---

[3] ADM removed this case to federal court, but the case was remanded to the Arkansas circuit court because the petition for removal was untimely.

necropsy reports for some hogs indicated as the cause of death salmonella group B, a new strain of salmonella not detected as a cause of death in Beadles's hogs prior to July 21, 1997.

6. The increase in Beadles's annual hog-death loss from 1997 through 2001 was "the result of diseases transmitted from hogs that were returned from the July 21, 1997 shipment infecting other hogs in the facility and infecting the facility itself."

7. ADM's failure to disclose the alleged dioxin contamination resulted in total damage to Beadles in the amount of $309,371.58.

## II. Analysis

■ We reverse and dismiss because the trial court improperly admitted hearsay evidence regarding IBP's reason for rejecting the hog shipment, and, absent such evidence, Beadle's claim fails because no other proof demonstrated why IBP rejected the shipment. The trial court determined that ADM was liable for fraud in failing to inform Beadles that its soybean meal was possibly contaminated. A plaintiff suing for fraud must establish the following: 1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) an intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) damage suffered as a result of the reliance. *Tyson Foods, Inc. v. Davis*, 347 Ark. 566, 66 S.W.3d 568 (2002). Thus, Beadles was required to prove, *inter alia*, that IBP rejected the hog shipment because it believed that ADM had sold Beadles possibly contaminated soybean meal, and that this rejection caused Beadles's damages. Yet, because Beadles did not depose anyone from IBP or call anyone from IBP to testify, no direct evidence on that specific issue was obtained from IBP. Instead, Beadles, to its detriment, relied on various hearsay documents to prove its claim.

The first item of hearsay evidence at issue is Exhibit Z, a memo to Beadles dated January 15, 1998, from Larry Bertrand, IBP's Area Procurement Supervisor. In that memo, Bertrand stated that IBP stopped the shipment of hogs "based on an official notification that Beadles Enterprises may have received feed for their hogs that contained contaminated ball clay." In addition,

Wayne Sr. testified that his son, Wayne Jr., told him about a telephone conversation with someone at IBP, who informed him (Wayne Jr.) that the shipment was being rejected for the same reason. Over ADM's further hearsay objections, Wayne Jr. also testified as to the substance of his telephone conversation with the IBP representative.

ADM raised hearsay objections to both the admission of Exhibit Z and the testimony regarding the substance of the telephone conversation. The court admitted the evidence for the limited purpose of explaining the subsequent action taken by Beadles but not for the purpose of establishing the truth of what was stated in the memo or in the telephone conversation. We hold that reversal is warranted because the evidence was either inadmissible hearsay, or if it was not, then because Beadles's claim lacks proof of an essential element: why IBP rejected the shipment of hogs.

Hearsay is an out-of-court statement made by someone other than the declarant that is offered to prove the truth of the matter asserted. Ark. R. Evid. 801(c). Evidence that is otherwise classified as hearsay may nonetheless be admitted for purposes other than to show the truth of the matter being asserted, such as to show a course of conduct or the basis for an action. *Piercy v. Wal-Mart Stores, Inc.*, 311 Ark. 424, 844 S.W.2d 337 (1993). We will not reverse a trial court's ruling regarding the exclusion of hearsay evidence absent an abuse of discretion. *Id.* We hold that the trial court abused its discretion in this case in admitting Exhibit Z and the testimony regarding Wayne Jr.'s telephone conversation.

The hearsay statement here, whether in the form of the memo or the testimony, was that IBP rejected the hogs because of the allegation that Beadles had received contaminated soybean meal. The following colloquy illustrates the hearsay error committed by the trial court. After the trial court allowed Wayne Sr. to confirm the accuracy of a report from the federal government through his own personal knowledge, Beadles then moved to introduce Exhibit Z, the IBP memo, as follows:

> BEADLES'S COUNSEL: Your Honor, again we would seek to introduce Plaintiff's Exhibit Z, the memo from IBP to Wayne Beadles. *And Mr. Beadles, through his own knowledge, confirmed those statements to be accurate, and that is exactly what happened to his hogs.*

ADM's COUNSEL: I'll just renew my prior objection, Your Honor. The document is hearsay, and there's not been adequate foundation that Mr. Beadles has personal knowledge of statements that are contained in the documents.

BEADLES's COUNSEL: Your Honor, I just got through, *he just got through saying they were absolutely accurate and that, in fact, is exactly what happened.*

COURT: *I think that's what he testified to,* let it be received.

(Emphasis added.)

Thus, Beadles sought to confirm that "exactly what happened to [Beadles's] hogs" was what was stated in the IBP memo and the trial court allowed it to do that, clearly demonstrating that the "truth of the matter" asserted by the evidence was not whether the soybean meal was in fact contaminated, but rather, that the allegation that the shipped hogs had been fed allegedly contaminated feed was the reason that IBP rejected the shipment. Beadles agrees that it was the *assertion* of contamination itself that caused its animals to be unmerchantable. If the shipment had not been rejected for that reason, then offering evidence of Beadles's subsequent course of conduct in returning the hogs made no sense. In other words, neither the memo nor the testimony could have been probative *unless* admitted to prove why IBP rejected the shipment.

■    Similarly, the trial court erred in admitting Exhibit BB, a list labeled "Soybean Meal Consignees." Wayne Sr. testified that this list was faxed to him after IBP informed him that Beadles was on a list of purchasers who had bought possibly contaminated feed. ADM objected on the ground of hearsay and lack of foundation because the list contained no information regarding contaminated soybean meal; it merely listed buyers, their addresses, and what appeared to be an amount of soybean meal purchased. The trial court admitted the document for the purpose of explaining why Beadles could not sell his hogs but not for the truth of the matter as to whether Beadles had purchased contaminated soybean meal.

Like Exhibit Z and the testimony regarding Wayne Jr.'s telephone conversation, the only way that the list could have been probative was to prove why IBP rejected the shipment. If the list was not admitted to show that IBP rejected the shipment *because Beadles's name was on the list,* then the list was not probative to establish why Beadles could not sell their hogs.

However, reversal is warranted even if the testimony was admitted for a reason other than to establish why IBP rejected the shipment. No one from IBP testified; thus the *only* evidence that IBP rejected the shipment due to its belief that Beadles's hogs had been fed contaminated soybean meal was the memo, the testimony regarding the phone call, and the list of ADM's purchasers. Once this evidence is excluded there is no other evidence to explain why IBP believed that Beadles had fed its hogs allegedly contaminated feed.

■ Beadles first asserts that the evidence was admissible as reputation evidence, pursuant to Ark. R. Evid. 803(20), which provides an exception to the hearsay rule for reputation of events of general history important to the community or state or nation. It maintains that the memo and testimony regarding the telephone conversation was admissible as proof of ADM's reputation for selling allegedly contaminated soybean meal.

However, evidence that would otherwise be hearsay is admissible pursuant to the hearsay exception contained within Rule 803 because such evidence is considered to have sufficient indicia of reliability or trustworthiness. *See Ward v. State*, 298 Ark. 448, 770 S.W.2d 109 (1989). The unsupported testimony of two interested parties and the confirmation of the contents of a hearsay memo by one of those parties, which itself was based on double-hearsay (Wayne Sr.'s statements regarding Wayne Jr.'s hearsay statements about the IBP call) hardly constitutes the type of necessary reliability or trustworthiness required to qualify as a hearsay exception under Rule 803(20).

■ Additionally, Beadles urges that because Wayne Sr. testified that he could confirm the accuracy of the statements contained in Exhibit Z with his own knowledge, the testimony was properly admitted under Ark. R. Evid. 701, which allows lay persons to offer opinions or inferences if they are rationally based on the perception of the witness. However, Beadles offers no persuasive authority that inadmissible hearsay under Rule 803 constitutes an otherwise admissible opinion or inference under Rule 701.

Beadles lastly points to other documents admitted for the purpose of proving when ADM learned of the allegation that its soybean meal had been contaminated. Clearly, these documents do not prove what *IBP* knew, when it knew it, or why it rejected the shipment of hogs.

■ Accordingly, if this evidence was admitted merely to show Beadles's reasons for its action or course of conduct — why it was unable to sell its hogs and why it returned the hogs to the farm — then *no other evidence* was offered to prove an essential element of Beadles claim against ADM: that the hogs contracted salmonella group B at the receiving station, where they were stored because IBP rejected the shipment based on its belief that ADM sold Beadles soybean meal that may have been contaminated. It is reversible error for a trial court to admit hearsay evidence when it is the only proof of an essential element of a claim. *Eichelberger v. State*, 323 Ark. 551, 916 S.W.2d 109 (1996); *Taylor v. Samuels*, 238 Ark. 70, 378 S.W.2d 200 (1964). As such, the trial court improperly admitted the memo and the testimony regarding Wayne Jr.'s telephone call.

■ Finally, we do not remand for retrial based on simple failure of proof because once the erroneous evidence is excluded, Beadles's claim is devoid of proof of an essential element. *McAdams v. Ellington*, 333 Ark. 362, 970 S.W.2d 203 (1998) (affirming dismissal of a fraud claim where the plaintiff failed to allege facts to satisfy all of the elements of fraud). When the record affirmatively shows that there can be no recovery on remand, we dismiss. *Womack v. First State Bank of Calico Rock*, 21 Ark. App. 33, 728 S.W.2d 194 (1987). Therefore, we reverse and dismiss the judgment and award ADM costs expended for prosecuting the appeal. Because we reverse and dismiss based on the improper admission of the hearsay testimony, we do not address ADM's remaining arguments.

Reversed and dismissed.

VAUGHT and ROAF, JJ., agree.