ARCHER-DANIELS-MIDLAND COMPANY *v.*
BEADLES ENTERPRISES, INC.

05-1192                                           238 S.W.3d 79

Supreme Court of Arkansas
Opinion delivered June 29, 2006

[Rehearing denied September 7, 2006.*]

---

* GLAZE, J., would grant rehearing. GUNTER, J., not participating.

2

*Barber, McCaskill, Jones & Hale, P.A.*, by: *D. Keith Fortner*, for appellant.

*Moore, Serio, & Bishop*, by: *Robert G. Serio*, and *Daggett, Donovan, Perry, and Flowers*, by: *Robert J. Donovan*, for appellee.

J IM HANNAH, Chief Justice. Appellee Beadles Enterprises, Inc., is a hog-finishing operation owned by Wayne Beadles, Sr., and Wayne Beadles, Jr. This operation takes young hogs, feeds them until they attain a certain weight, and then sells them to slaughterhouses. Beadles makes its own hog feed, part of which contains soybean meal that is purchased from appellant Archer-

Daniels-Midland Company (ADM).[1] In April and May of 1997, Beadles purchased two shipments of soybean meal from ADM. ADM later learned that the soybean meal it had sold to Beadles might have contained ball clay that was contaminated with dioxin; however, ADM did not inform Beadles. Subsequently, on July 21, 1997, Beadles sold and attempted to ship 126 hogs that had been fed the allegedly contaminated feed to an Iowa purchaser, IBP, Inc. IBP, having learned of the alleged contamination from "an official notification," halted the shipment in Missouri, and Beadles's hogs were stored temporarily at a receiving center. During this time, three hogs were slaughtered and tested for dioxin; the test results were negative. In addition, another hog died, though the cause of death was unknown. Beadles then shipped the remaining 122 hogs back to its farm.

Beadles's hogs are kept in an "old barn" and a "new barn," which are approximately fifty yards apart. Beadles returned the 122 hogs to the new barn, from which they originated. When the hogs returned, they were extremely stressed and laid in an open-flush gutter system to cool themselves; this system washed feces and dirt from the hogs. Other hogs in the new barn that were penned down slope came into contact with that water, feces, and dirt. The IBP hogs were ultimately reshipped and sold to IBP at a reduced price because they had lost weight. The hogs that were penned down slope from the IBP hogs began dying approximately two or three weeks thereafter. Beadles sued, claiming that while being stored at the receiving center, the IBP shipment of hogs became infected with salmonella group B, which somehow spread to Beadles's other hogs when the IBP shipment was returned and caused an increased death rate in its hog operation through 2001.

A bench trial was held on October 29-30, 2003. The circuit court concluded that ADM was liable for fraud and made numerous findings of fact, including the following:

1. ADM knew prior to July 21, 1997, and no later than July 7, 1997, that the federal government was concerned that the soybean meal ADM sold in April and May of that year was contaminated.

2. ADM had a special relationship with Beadles based on their past dealings, and based on its knowledge that the soybean meal it

---

[1] ADM is the successor company to Quincy Soybean Company, which sold the allegedly contaminated soybean meal to Beadles.

sold to Beadles would be fed to hogs and then placed into the food chain for ultimate human consumption.

3. ADM had a duty to disclose to Beadles that the feed ADM had sold Beadles in April and May, 1997, might be contaminated with dioxin, and ADM's failure to disclose such information breached its duty to Beadles.

4. ADM's failure to disclose to Beadles that the soybean meal ADM had sold Beadles in April and May, 1997, was alleged to be contaminated with dioxin resulted in Beadles sustaining damage.

5. Soon after the 122 hogs were again shipped to IBP, other hogs in the new barn began to have symptoms of salmonella and other diseases. Hogs from the facility began to die. Some hogs from the facility were sent to Arkansas Livestock and Poultry Commission for necropsy. The cause of death for those hogs was listed as salmonella group B, a new strain of salmonella not detected as a cause of death prior to July 21, 1997.

6. The increase in Beadles's annual hog-death loss from 1997 through 2001 was "the result of diseases transmitted from hogs that were returned from the July 21, 1997, shipment infecting other hogs in the facility and infecting the facility itself."

7. ADM's failure to disclose the alleged dioxin contamination resulted in total damage to Beadles in the amount of $309,371.58.

ADM appealed, and the court of appeals reversed and dismissed. *See Archer-Daniels-Midland Co. v. Beadles Enters., Inc.*, 92 Ark. App. 462, 215 S.W.3d 675 (2005). Beadles then filed a petition for review, which this court granted, pursuant to Ark. Sup. Ct. R. 1-2(e). Upon a petition for review, we consider an appeal as though it had originally been filed in this court. *Wallace v. West Fraser South, Inc.*, 365 Ark. 68, 225 S.W.3d 361 (2006). On appeal, ADM argues: (1) there was no evidence salmonella group B or any other diseases came from the July 21, 1997, shipment; (2) there was no admissible evidence that IBP rejected the shipment because of concerns about dioxin; (3) there was an inadequate foundation for Beadles's evidence of damages; and (4) other findings and evidentiary errors require reversal. We affirm.

In bench trials, the standard of review on appeal is not whether there is substantial evidence to support the findings of the court, but whether the judge's findings were clearly erroneous or clearly against the preponderance of the evidence. *Chavers v. Epsco,*

*Inc.*, 352 Ark. 65, 98 S.W.3d 421 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *Id.* Disputed facts and determinations of credibility are within the province of the fact-finder. *Id.*

To establish fraud, a plaintiff must show: (1) a false representation of material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance upon the representation; and (5) damage suffered as a result of the reliance. *McAdams v. Ellington*, 333 Ark. 362, 970 S.W.2d 203 (1998). Constructive fraud can exist in cases of breaches of fiduciary duties, but a plaintiff must show a material representation of fact. *See Scollard v. Scollard*, 329 Ark. 83, 947 S.W.2d 345 (1997). A confidential or special relationship between parties gives rise to a duty to speak and clarify information upon which others might rely. *See SEECO, Inc. v. Hales*, 341 Ark. 673, 22 S.W.3d 157 (2000).

ADM argues that there is no evidence of the cause of death of over 95% of Beadles's 2600-plus hogs, no evidence that any of the hogs contracted salmonella group B from the Missouri receiving center in July 1997, and no evidence that any of the rejected hogs ever had salmonella group B. Accordingly, ADM argues that this court should reverse and dismiss the circuit court's findings and judgment.

The record reveals that Wayne Sr. testified that the returned hogs were placed in pens 3, 4, and 5 of the "new barn," and that these were the same pens that those hogs had been in prior to shipment. He stated that when the hogs were returned, they were extremely stressed and laid in the gutter to cool off in the water. He explained that the open flush gutter system used in the barn washed the dirt and grime off those hogs and that the pigs below those pens came in contact with all that dirt and grime. He testified that the pigs in the lower pens began to get sick, noting that the pigs would not eat, drink, or move around. He also testified that the pigs developed diarrhea. Wayne Sr. testified that soon, the pigs began dying, and that in one pen alone, 60% of the hogs were lost. Wayne Sr. said that more pigs were lost in one pen than were lost in the entire barn in the seven years prior to July 21, 1997.

Wayne Jr. testified that some of the pigs exhibited purple bellies, snouts, and ears. ADM states that these are the same

symptoms of actinobacillus pleuropneumonia, and that the circuit court was simply left to speculate that the over 2600 hogs Beadles lost in 1997 and thereafter died from salmonella group B, as opposed to actinobacillus pleuropneumonia or other diseases present at Beadles's facility many months prior to July 1997. ADM states that the mere fact that Beadles's hogs died was not, of itself, evidence that ADM somehow caused the death of the hogs.

There is no dispute that none of the hogs from the July 21, 1997, shipment underwent necropsies. However, Beadles points to other evidence that demonstrated that the hogs from that shipment contracted salmonella group B. Dr. Robert Conner, Jr., a veterinarian who testified on behalf of Beadles, explained how hogs generally die from diseases. Dr. Conner stated that stress was a major factor in contracting diseases, and that stress could be brought on by moving pigs, depriving pigs of feed and water, and crowding the pigs too tightly. Dr. Conner explained that stress causes the bacteria in a hog to start multiplying rapidly to literally billions per gram of intestinal content. He described how hogs undergo stress being hauled to slaughter, stating that the hogs would urinate and defecate between thirty and fifty pounds of waste, and that the waste would contaminate the truck. As to the July 21, 1997, shipment, Dr. Conner opined that due to the stressful environment, hauling the pigs to slaughter and then bringing them back to Beadles's facility was a "disaster waiting to happen."

Dr. Conner opined that the jump of a 3% loss in 1996 to a 40% loss in 1997 was an explosion of disease caused by hauling the hogs back to the Beadles's facility. He further stated that, based on the continuing losses from 1998 to 2001, the death loss was related to salmonella group B. Dr. Conner opined that most of the hogs died of contamination brought on by the hogs that were returned to the facility. Dr. Conner also opined that the salmonella group B came from either the truck hauling the July 21, 1997, shipment or from the holding pens at the receiving center in Missouri. He based this opinion on the fact that the salmonella group B appeared for the first time in an August 1997 necropsy report, which was after the rejected hogs were returned to the Beadles's facility, and the fact that Beadles did not buy feeder pigs from "sale barns."[2]

In light of the foregoing evidence, we do not agree with ADM's contention that there was no evidence that salmonella

---

[2] Wayne Sr. testified that a "sale barn" is a place where hogs and other animals are brought to a barn for sale with the hogs presumably coming into contact with other animals.

group B or any other diseases came from the July 21, 1997, shipment. Further, it is clear that the circuit court found credible Dr. Conner's testimony concerning what he believed was the cause of the increased death loss at Beadles's facility. This court gives due deference to the superior position of the trial judge to determine the credibility of witnesses and the weight to be accorded to their testimony. *City of Rockport v. City of Malvern*, 356 Ark. 393, 155 S.W.3d 9 (2004). With this standard in mind, we cannot say that the circuit court clearly erred in finding that the increase in the annual death loss in Beadles's hog herd from 1997 through 2001 was caused by salmonella group B and other diseases that were introduced by the rejected hogs.

Next, ADM argues that there was no admissible evidence that IBP rejected the shipment because of concerns about dioxin. The circuit court found that IBP rejected the shipment because the hogs had a reputation of having eaten soybean meal contaminated with dioxin. ADM points out that no one from IBP testified at trial, and that all of Beadles's testimony and evidence relating to this issue was admitted over ADM's hearsay objection. ADM states that this issue is significant because in order to hold ADM responsible for the shipment being returned to Beadles's facility and allegedly spreading diseases, Beadles had to prove that IBP rejected the shipment based on something ADM did or failed to do. Stated differently, ADM contends that if there was no admissible evidence to show why IBP rejected the shipment, then ADM could not be held responsible for that rejection and the events that allegedly followed. We disagree.

As previously noted, the circuit court found that ADM had a special relationship with Beadles based on their past dealings and based on its knowledge that the soybean meal it sold to Beadles would be fed to hogs and then placed into the food chain for ultimate human consumption. Based on this special relationship, the circuit court concluded that ADM had a duty to disclose to Beadles that the soybean meal it sold to Beadles was alleged to have been contaminated with dioxin, and ADM's failure to disclose this information breached its duty to Beadles. We need not determine whether the circuit court abused its discretion in admitting evidence concerning the reason IBP rejected the shipment because the reason for rejection is not essential to Beadles's claim. Beadles contended that had it known that the soybean meal was allegedly

contaminated with dioxin, it either would not have shipped the hogs, or it would have tested the shipment prior to sending it out. Thus, it is immaterial why IBP rejected the shipment.

█ ADM next argues that there was an inadequate foundation for Beadles's evidence of damages. Dr. Conner established through necropsy reports that a new strain of salmonella had been introduced into Beadles's facility after the IBP shipment was returned to the facility. Dr. Conner further stated that most of the hogs died as a result of contamination from the return of shipped hogs to its facility. Beadles showed that the death rate among the hogs in its facility prior to July 21, 1997, was less than five percent, and that after July 21, it experienced an annual death loss in 1997 of 40.03%, in 1998 of 25.09%, in 1999 of 15.83%, in 2000 of 22.25%, and in 2001 of 28.5%. The circuit court concluded that the increase in the annual death loss in Beadles's hog herd from 1997 through 2001 was the result of diseases transmitted from hogs that were returned from the July 21, 1997, shipment infecting other hogs in the facility and infecting the facility itself. The circuit court stated that it was not necessary that Beadles establish with absolute certainty as to exclude every other reasonable conclusion that damages Beadles suffered were a result of the July 21, 1997, shipment of hogs that were returned to Beadles, causing an outbreak of salmonella and other diseases in its hog herd. Further, the circuit court concluded that it was sufficient that Beadles established by substantial evidence that the increased death loss in its hog herd was the result of salmonella and other diseases being spread by the returned shipment of hogs to the other hogs in the barns. We cannot say that the circuit court's findings are clearly erroneous.

█ Finally, ADM claims that the cumulative effect of several other erroneous findings and errors requires reversal. First, ADM argues that Exhibit BB, the list of purchasers of feed, was inadmissible hearsay and, further, that even if the list were admissible, it would not prove that IBP based the rejection of the shipment on Beadles's inclusion on the list. As previously noted, we need not determine whether the circuit court abused its discretion in admitting evidence to prove why IBP rejected the shipment because the reason for the rejection is not essential to Beadles's claim.

█ Next, ADM argues that the circuit court erroneously found that the cause of death for the hogs that were necropsied from the new barn was salmonella group B, a cause of death not

present on the farm prior to July 21, 1997. As pointed out by Beadles, while the necropsy reports do not specifically use the term "cause of death," they do use the term "diagnosis," and Dr. Conner testified that "diagnosis" referred to cause of death. ADM's argument is without merit.

ADM next argues that the circuit court abused its discretion in admitting into evidence, over ADM's objection, interrogatory responses and documents produced by ADM in response to Beadles's requests for production of documents. We disagree. As noted in *Piercy v. Wal-Mart Stores, Inc.*, 311 Ark. 424, 844 S.W.2d 337 (1993) (supplemental opinion), answers to interrogatories may qualify as admissions by a party-opponent which are not hearsay, as defined, and therefore may constitute substantive evidence and be admissible in a party's case-in-chief.

Finally, ADM argues that the circuit court abused its discretion in admitting over ADM's hearsay objection a certified copy of a letter from the FDA. The letter at issue is a statement and warning sent out by the FDA under its duty to protect the public from consuming adulterated food. Further, the letter, which was addressed to feed mill operators, stated that recipients of contaminated soybean meal were to discontinue use of the soybean meal and to hold any remaining soybean meal and feed made from that soybean meal. Beadles contends that the letter was admissible pursuant to Ark. R. Evid. 803(8). We agree. Pursuant to Rule 803(8), "records, reports, statements, or data compilations in any form of a public office or agency setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law" are not excluded by the hearsay rule. The circuit court did not abuse its discretion in admitting the letter.

In sum, because we find that the circuit court's findings are not clearly erroneous, we affirm.

Affirmed.

GLAZE, J., dissents.

GUNTER, J., not participating.

Tom Glaze, Justice, dissenting. The majority finds that the reason for IBP's rejection of the shipment of hogs is of no consequence to Beadles's claim. The court explains its position as follows:

> We need not determine whether the circuit court abused its discretion in admitting evidence concerning the reason why IBP rejected the shipment because the reason for rejection is not essential to Beadles's claim. Beadles contended that had it known that the soybean meal was allegedly contaminated with dioxin, it either would not have shipped the hogs, or it would have tested the shipment prior to sending it out. Thus, it is immaterial why IBP rejected the shipment.

The basis for the majority's decision is both ambiguous and illogical; therefore, I disagree and respectfully dissent.

In order to establish a valid cause of action for fraud or constructive fraud, a plaintiff must show — among the other elements[1] — that the alleged damages would not have occurred but for the conduct of the defendant. *See Tyson Foods, Inc. v. Davis*, 347 Ark. 566, 66 S.W.3d 568 (2002). Here, Beadles claims that ADM's failure to warn of the potential dioxin contamination put into motion a chain of events that resulted in the loss of 2600 hogs. According to Beadles's allegations, the causal chain progressed as follows:

- ADM failed to warn Beadles of the potential dioxin contamination;

- Beadles, assuming that nothing was wrong, shipped its hogs to IBP, a hog buyer located in Iowa;

- IBP rejected the hogs, en route, because IBP believed that ADM has possibly sold Beadles contaminated soybean meal;

---

[1] The tort of fraud or deceit consists of five elements that the plaintiff must prove by a preponderance of the evidence: (1) a false representation of a material fact; (2) knowledge that the representation is false or that there is insufficient evidence upon which to make the representation; (3) intent to induce action or inaction in reliance upon the representation; (4) justifiable reliance on the representation; and (5) *damage suffered as a result of the reliance. See Tyson Foods, Inc., infra* (emphasis added). Constructive fraud can exist in cases of breaches of fiduciary duties, but a plaintiff must show a material representation of fact. *See Scollard v. Scollard*, 329 Ark. 83, 947 S.W.2d 345 (1997). Constructive fraud, while requiring proof of all the necessary elements of actual fraud, misrepresentation, and deceit, may be proven even when there is a complete absence of any moral wrong or evil intention. *See Roach v. Concord Boat Corp.*, 317 Ark. 474, 880 S.W.2d 305 (1994).

- Beadles was forced to store its hogs at a holding facility in Missouri;

- while in the holding facility, the hogs contracted salmonella and other diseases;

- the infected hogs were then transported back to Beadles's facility, where they infected other hogs;

- Beadles suffered the loss of 2600 hogs as a result.

Each of these allegations provides a link in a causal chain that logically proves that Beadles's damages were caused by ADM's failure to warn. The failure to substantiate any one of these allegations will result in the removal of a link and a break in the causal chain.

According to the majority, Beadles is entitled to damages, regardless of the reason IBP rejected the hog shipment. This reasoning is incorrect. Let us assume, for argument's sake, that IBP rejected the hogs for an unrelated reason, such as a too-high price for the hogs. Under this hypothetical, Beadles would have lost its 2600 hogs regardless of ADM's failure to warn. Given this situation, it would be impossible for Beadles to prove that ADM was the cause-in-fact of Beadles's alleged damages. This example illustrates that, in order to prove damages, Beadles had to show that IBP rejected the hog shipment because IBP feared that the hogs were contaminated.[2] Only then can Beadles establish a causal chain and show that ADM's actions caused Beadles's damages.

The court of appeals addressed this issue and correctly held that, at trial, Beadles relied on inadmissible hearsay to prove why IBP rejected the shipment. *See Archer-Daniels-Midland Co. v. Beadles Enters., Inc,* 92 Ark. App. 462, 215 S.W.3d 675 (2005).[3] Once the

---

[2] The reasoning follows that, if ADM had warned Beadles of the alleged contamination, then Beadles would not have shipped its hogs, or it would have tested the hogs prior to shipment. Either way, the hogs would not have been rejected mid-transit, would not have contracted salmonella, and would not have contaminated Beadles's facility.

[3] Beadles presented the following evidence to prove why IBP rejected the hog shipment:

(1) Exhibit Z, a memo to Beadles, dated January 15, 1998, from Larry Betrand, IBP's Area Procurement Supervisor. In this memo, Bertrand states that IBP stopped

inadmissible hearsay is set aside, there is no evidence to substantiate Beadles's claim as to why IBP rejected the hog shipment. Consequently, Beadles failed to prove that ADM's actions were the cause-in-fact of Beadles's alleged damages. In short, Beadles's claim should not succeed, due to Beadles's failure to prove damages. For this reason, I dissent.

---

the shipment of hogs "based on an official notification that Beadles Enterprises may have received feed for their hogs that contained contaminated ball clay";

(2) Wayne Beadles, Sr., testified that his son, Wayne Beadles, Jr., told him about a telephone conversation with someone at IBP who informed Wayne Jr. that the shipment was being rejected for the same reason;

(3) Wayne Beadles, Jr., also testified as to the substance of his telephone conversation with the IBP representative; and

(4) Exhibit BB, a list labeled "Soybean Meal Consignees." Wayne Beadles, Sr., testified that this list was faxed to him after IBP informed him that Beadles was on a list of purchasers who had possibly bought contaminated feed.

Each of these pieces of evidence qualifies as inadmissible hearsay; that is, they are "out-of-court statement[s] made by someone other than the declarant that [are] offered to prove the truth of the matter asserted." *See* Ark. R. Evid. 801(c).